UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RENEE BISHOP-MCKEAN,

               Plaintiff,

    v.

WASHINGTON DEPARTMENT OF
CORRECTIONS, et al.,

               Defendants.

CASE NO. 3:20-CV-5416-JLR-DWC

REPORT AND RECOMMENDATION

Noting Date: August 5, 2022

       The District Court referred this action, filed pursuant to 42 U.S.C. § 1983, to United States Magistrate Judge David W. Christel. Currently pending before the Court are the parties' cross-motions for summary judgment (Dkts. 112 and 116).

       For the reasons discussed below, the Court recommends defendants' motion for summary judgment be granted, and plaintiff's motion be denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

       Plaintiff, a prisoner proceeding *pro se* and *in forma pauperis* who is housed at the Washington Corrections center for Women ("WCCW"), filed this action on May 1, 2020. Dkt. 1.

1   After multiple rounds of screening during which the Court found plaintiff's original complaint

2   and two subsequent amended complaints to be deficient but granted leave to amend (Dkts. 7, 13,

3   16), plaintiff filed her Third Amended Complaint—the operative complaint in this matter—on

4   October 16, 2020. Dkt. 17.[1] Plaintiff alleges defendants violated her Eighth Amendment rights

5   by acting with deliberate indifference to her serious medical needs in their treatment of her

6   cervical spine condition and a related post-surgical infection. *Id.*

7          The Court directed service of the Third Amended Complaint on November 2, 2020 and

8   defendants filed an Answer. Dkts. 18, 31. Discovery closed on June 21, 2021. Dkt. 34.

9   Defendants filed a motion for summary judgment and plaintiff filed a motion for injunctive relief

10  (which the Court construed as a cross-motion for summary judgment). Dkts. 83, 92. However,

11  because defendants were permitted to amend their Answer to include an additional affirmative

12  defense, the Court struck the original motions and permitted the parties to file amended motions.

13  Dkt. 110. Pursuant to the schedule established by the Court, defendants filed their amended

14  motion for summary judgment, together with the Declaration of defendant Mary L. Colter, M.D.

15  on November 24, 2021. Dkts. 112, 113. Plaintiff filed a response and cross-motion for summary

16  judgment, together with attached exhibits. Dkt. 116. Defendants filed a consolidated response to

17  plaintiff's motion and reply in support of their motion, together with a second declaration from

18  defendant Colter. Dkts. 118, 119.

19         On January 1, 2022, plaintiff filed what appeared to be a reply. Dkt. 120. However, on

20  March 21, 2022, plaintiff filed a request for an extension of time, stating she had not received

21  defendants' response when it had been filed and had only recently received it (and other

22

23  ───────────────

24  [1] The Court denied plaintiff's motion to file a fourth amended complaint which sought to add an access to courts claim against defendant Colter. Dkt. 110.

documents filed in this case, including an order from the Court)—apparently because her facility

had been without a law librarian for several months. Dkt. 123. The Court therefore permitted

plaintiff to file a new reply—but because only one reply is permitted under the Federal Rules of

Civil Procedure and the Local Rules of this District, the court struck plaintiff's prior

submission.[2] Dkt. 130. Plaintiff filed an unsigned and unattested "affidavit" on April 13, 2022[3],

and filed her reply on April 22, 2022. Dkts. 131, 134. Plaintiff's reply was filed nine days after

the deadline established by the court; however, defendants have not objected and the Court will

accept the tardy filing.

## II. FACTS

### A.   Plaintiff's Third Amended Complaint

Plaintiff brings claims against WCCW Warden Deborah Wofford, WCCW Chief Medical

Officer Dr. Mary Colter, WCCW Physician's Assistant Tania Boyce, PA-C, and WCCW nurses

Jesse Suarez, RN and Megan Meitninger-Dunlap, RN.[4] The Third Amended Complaint

("complaint") states plaintiff's Eighth Amendment claims are for constitutionally inadequate

---

[2] The Court also struck a subsequently submitted reply because it did not follow the Court's admonition that plaintiff comply with the page limitations contained in the Local Rules; the Court had previously accepted plaintiff's overlength briefing but warned plaintiff her reply must comply with the 12-page limit of LCR 7(e)(3). Dkt. 117 at 2; Dkt. 130 at 4. Plaintiff was provided with an opportunity to file a new reply complying with the Rules and has now done so. Dkts. 130, 134. Plaintiff expresses confusion as to which documents have been stricken. Dkt. 134 at 1. The Court clarifies that it has stricken only plaintiff's previously-submitted replies (Dkts. 120 and 126) because they have been replaced by plaintiff's reply filed April 22, 2022 (Dkt. 134).

[3] This is the second unsigned declaration or affidavit plaintiff has filed. The Court noted plaintiff's original declaration (Dkt. 116 at 171–193) was unsigned and unattested, explained the necessity of those actions, and provided plaintiff an opportunity to correct the deficiency by filing a praecipe attaching a properly attested signature page. Dkts. 122, 130. After an initial error, plaintiff ultimately remedied the deficiency in her first declaration. Dkt. 132. But notwithstanding the prior warning, plaintiff has repeated the signature deficiency with her second affidavit. Dkt. 131. Defendants have not moved to strike the defective second affidavit. The Court finds the affidavit does not set forth new or additional evidence that would establish a genuine issue of material fact, so it need not decide whether to *sua sponte* strike the affidavit.

[4] The Court previously dismissed plaintiff's claims against state agency defendants—the Washington Department of Corrections ("DOC") and WCCW. Dkt. 44. Plaintiff expresses confusion about the status of defendant Megan Meitninger-Dunlap. *See* Dkt. 116 at 4–5. To be clear, only the public entity defendants (Washington Department of Corrections and WCCW) have been dismissed as improper defendants. Dkt. 44. Defendant Meitninger-Dunlap remains a defendant in this case.

1  post-operative medical care after her neck surgery "from 10-17-2017 through 11-02-2017" and

2  are "based on the second medical emergency called by Bishop on 10-25-17 at 12:40 pm." Dkt.

3  17 at 10. Plaintiff alleges that, following cervical spine surgery, she did not receive adequate

4  post-operative care, resulting in an infection of her surgical incision with Methicillin Resistant

5  Staphylococcus Aureus ("MRSA"); plaintiff also alleges she was prematurely tapered off opioid

6  pain medication nine days after her surgery. *Id*. at 11–12, 22. Plaintiff also appears to assert

7  claims relating to the denial of earlier requests for pain management and the surgery she

8  ultimately received in 2017, which date back to 2012. *Id*. at 21. Finally, plaintiff alleges

9  defendant Wofford failed to process an emergency grievance, violating plaintiff's First and

10  Fourteenth Amendment rights. *Id*. at 17.

11  **B.  Evidence**

12        Defendants submitted two declarations from defendant Colter, as well as plaintiff's

13  applicable medical records. Dkts. 113, 119, 113-1. Plaintiff submitted extensive attachments to

14  her cross-motion; those pertaining to her post-operative treatment include medical records (some

15  of which duplicate those submitted by defendants), plaintiff's declaration, and declarations of

16  fellow inmates. *See* Dkt. 116 at 132, 139, 141, 142, 143, 147–164, 169–70 (medical records), *Id*.

17  at 171–193 (plaintiff's declaration); *Id*. at 130–31 (declaration of Shelley Arndt).[5]  Plaintiff's

18  Third Amended Complaint—the operative complaint in this matter—was not signed under

19  penalty of perjury. Accordingly, the complaint itself is not considered as evidence. *See Jones v.*

20

21

22       [5] Plaintiff's submissions were voluminous, including materials that do not constitute admissible evidence (s*ee, e.g.* Dkt. 116 at 135–138 (fragments of previous unverified and unfiled proposed complaints)) and materials pertaining to time periods outside the purview of this case. In addition, plaintiff's lengthy declaration intersperses admissible testimony based on her personal knowledge with inadmissible argument, speculation, conclusory

23  statements and medical opinions. The Court has considered only admissible, material evidence and testimony within plaintiff's personal knowledge. *See Orr v. Bank of Am.,* 285 F.3d 764, 773 (9th Cir. 2002) (a court may consider

24  only admissible evidence in ruling on a motion for summary judgment).

1  *Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (in a *pro se* case, the court will consider a complaint

2  signed under penalty of perjury as evidence to the extent it is based upon personal knowledge

3  that would be admissible in evidence); *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir.

4  1995) (To be a "verified" complaint considered as evidence, the complaint must be signed under

5  penalty of perjury in compliance with 28 U.S.C. § 1746). However, plaintiff has attached pages

6  10–18 of her Third Amended Complaint to her declaration (Dkt. 116 at 186–193); accordingly,

7  those pages, to the extent they set forth facts admissible in evidence and within plaintiff's

8  personal knowledge, may be considered as evidence.

9      The following facts are derived largely from plaintiff's medical records[6] or defendant

10  Colter's summary of them and, except where noted, are not disputed.

11  1.   Plaintiff's Prior History of Cervical Spine Issues

12      Plaintiff's medical records reflect a long history of chronic cervical spine issues, reaching

13  back to 1998 and predating her imprisonment—including a failed cervical spine fusion with

14  broken screws. Dkt. 113 at ¶ 7; Dkt. 113-1 at 2–4. After plaintiff's imprisonment, her cervical

15  spine issues continued, and the Department of Corrections ("DOC") Care Review Committee

16  ("CRC") reviewed her case on several occasions. On April 29, 2015, the CRC approved an

17  outside neurosurgical consultation with Dr. Alex Mohit, who recommended continued

18  conservative management with a muscle relaxant (Robaxin) and non-steroidal anti-inflammatory

19  ("NSAID") medication. Dkt. 113 at ¶ 9; Dkt. 113-1 at 6, 8–10 (Dkt. 116 at 112–14). Plaintiff

20  also received additional non-narcotic medications for her pain. Dkt. 113 at ¶ 11; Dkt. 113-1 at

21  12–13.

---

23      [6] Both parties submitted medical records, many of which are duplicative. Because defendants have
submitted a more complete set of records, the Court cites primarily to defendants' submissions, but where a
24  duplicate record was also submitted by plaintiff, it is also cited in parentheses.

1    2.    October 15, 2017 Surgery

2        The CRC again considered plaintiff's case in May 2017 and recommended denying her

3    request for a chronic Robaxin trial and additional neurosurgery consultations. Dkt. 113 at ¶ 12.

4    Dkt. 113-1 at 17. However, after a follow-up review of new imaging records showing the

5    development of instability in the cervical spine, the CRC approved a second neurosurgery

6    consultation with Dr. Mohit. Dkt. 113 at ¶ 14; Dkt. 113-1 at 19. Dr. Mohit recommended surgery

7    and on September 5, 2017, the CRC approved the recommended surgery. Dkt. 113 at ¶ 14; Dkt.

8    113-1 at 25. On October 15, 2017, Dr. Mohit performed a cervical fusion revision and

9    laminectomy procedure. Dkt. 113 at ¶ 17.

10    3.    Post-Surgical Follow-up Care October 17-24, 2017

11        Plaintiff returned to WCCW on October 17 and was admitted to WCCW's Inpatient

12    Treatment Unit ("IPU"). Dkt. 113 at ¶ 17. However, according to defendant Colter, plaintiff

13    became upset and destroyed furniture and fixtures in her room. *Id*. Defendant Colter states

14    plaintiff was transferred on October 19 to restrictive housing after threatening self-harm. *Id*.; *see*

15    *also* Dkt. 113-1 at 29 (reflecting plaintiff's transfer "after threatening self harm"). Plaintiff

16    admits she "had a fit" and "tore the room up." Dkt. 116 at 180, ¶ 78. She nonetheless contends

17    she should not have been transferred. *Id*.

18        The evidence shows plaintiff received post-surgical follow-up care from WCCW medical

19    staff and from her outside surgeon, Dr. Mohit. Defendant Colter avers Dr. Lisa Anderson saw

20    plaintiff on October 18 and defendant Colter saw her on October 19. Dkt. 113 at ¶ 17. Defendant

21    Colter examined the incision site, found it was clean and dry with no evidence of infection, and

22    changed the dressing. *Id*. at ¶ 18. Plaintiff's medical records show that after her transfer from the

23    IPU, nurses visited plaintiff multiple times, on October 19, 20, 21, 22 and 23, and plaintiff

24    received oxycodone pain medication until the prescription terminated on October 24, 2022. Dkt.

113-1 at 27–29, 91. Plaintiff also received methocarbamol[7] and ibuprofen. Dkt. 113-1 at 91. After initially refusing to permit a nurse to change her dressing on October 21, plaintiff permitted a different nurse to do so later that day; treatment records describe the wound at that time as "intact" and showing "scant" drainage. *Id*. at 27. On October 24, defendant Meitninger-Dunlap followed up with plaintiff to apply a dressing to her incision. *Id*. at 32. She noted the surgical site was "clean, dry, and intact" and had no odor, drainage or other sign of infection. *Id*. Defendant Meitninger-Dunlap also noted plaintiff's neck brace was removed when she arrived—an observation that is also made in prior nursing notes. *Id*., at 32, 28, 29. Plaintiff was advised of the importance of wearing the brace. *Id*. at 32.

Plaintiff makes a broad, conclusory, allegation that she received "zero" follow-up care at WCCW. *See*, *e.g.* Dkt 116 at p. 184, ¶ 121; Dkt. 17 at 11, ¶1.4. However, plaintiff also attaches medical records evidencing such care and provides no evidence controverting the additional medical records submitted by defendants discussing her post-operative medical care. *See*, *e.g.* Dkt. 116 at 143, 148, 150–60.

4.    October 25, 2017 Declarations of Medical Emergencies

Plaintiff's medical records reflect she declared two medical emergencies on October 25. First, plaintiff was seen by defendants Suarez and Boyce at 12:44 pm. Defendant Suarez's notes state plaintiff requested continuation of her pain medication and a pillow. Dkt. 113-1 at 34. Defendant Suarez reported no vital signs were taken due to plaintiff's agitation, pacing and insulting custodial staff. *Id*. Defendant Suarez also reported plaintiff had removed her cervical collar. *Id*. Defendant Boyce wrote a separate report noting plaintiff was "very agitated," had removed her neck brace, was "kicking and throwing things in her cell" and reported being upset

---

[7] Methocarbamol is the generic name for the brand-name Robaxin, a muscle relaxant. Dkt. 113 at ¶ 9.

because her oxycodone had been discontinued and she was experiencing pain; plaintiff also requested a pillow. *Id*. at 38 (Dkt. 116 at 132). Defendant Boyce reports she explained to plaintiff that since she was nine days post-operation, oxycodone was no longer indicated, but confirmed plaintiff was taking Robaxin twice daily. *Id*. Defendant Boyce also states plaintiff had removed her cervical collar and Boyce was therefore able to see the bandages covering plaintiff's incision were "intact with no visible blood or fluid." *Id*. Defendant Boyce's notes include orders to continue Robaxin and to issue a Health Status Report ("HSR")[8] for a pillow. *Id*. at 34, 38.

Plaintiff declared a second medical emergency later in the day on October 25, to which defendant Meitninger-Dunlap responded. Dkt. 113-1 at 36. Defendant Meitninger-Dunlap's Primary Encounter Report states plaintiff's "chief complaint" was her oxycodone pain medication had been "'cut off.'" *Id*. Secondarily, plaintiff requested a pillow and a dressing for her incision, which plaintiff reported felt wet to the touch. *Id*. Defendant Meitninger-Dunlap reports "visualiz[ing] the incision site," noting it was "stitched closed and well-approximated" and there was "no obvious drainage, no redness or other signs of infection at the site." *Id*. Defendant Meitninger-Dunlap provided gauze and tape to protect from any drainage that might occur, a pillow and case pursuant to the existing HSR, and advised plaintiff that, while oxycodone pain medication would not be reordered, plaintiff still had methocarbamol (Robaxin) and Tylenol ordered for continued pain management. *Id*. Defendant Meitninger-Dunlap also cautioned plaintiff to wear her cervical collar as prescribed. *Id*. Finally, defendant Meitninger-Dunlap threatened to issue an infraction for another medical emergency declaration "on this issue." *Id*.

---

[8] An HSR is a note written by a medical provider to notify custodial staff of an accommodation for a medical need. Dkt. 113 at ¶ 25.

1    Plaintiff provides a different account of the events on October 25. Plaintiff avers she

2  called the medical emergency "because there was green pus oozing from my neck." Dkt. 116 at

3  p. 181 ¶ 87. She claims the defendants would not have been able to see her incision because she

4  was wearing her neck brace, has long hair, and none of the defendants entered her cell and they

5  had only a small cell-front window to look through. *Id*. at 180.[9] Plaintiff has also submitted the

6  declaration of a fellow inmate, Shelley Arndt, who states she saw "green pus" coming from

7  plaintiff's post-surgical wound on October 24 and 25, 2017. Dkt. 116 at 130.

8    Plaintiff admits she "was hot" and "upset" because non-defendant custody staff had

9  delayed calling medical staff, and "sure did cuss out the sergeant." *Id*. at p. 181, ¶¶ 87, 92, 96.

10  But plaintiff states by the time defendants arrived, she was "only crying and redfaced." *Id*. at p.

11  182 ¶ 97.

12  5.   Post-October 25, 2017 Care, Infection Diagnosis and Treatment

13    Plaintiff saw her outside surgeon, Dr. Mohit, five days later on October 30, 2017. Dkt.

14  113-1 at 41. Dr. Mohit removed plaintiff's sutures at that visit. Dkt. 113 at ¶ 24. Dr. Mohit's

15  recommended follow-up does not include any notes of any issues or signs of infection with the

16  incision. Dkt. 116 at 149. Instead, Dr. Mohit notes plaintiff would benefit from a lower bunk and

17  pain management—stating a preference for hydrocodone "due to bone fusion" and noting non-

18  steroidal anti-inflammatories (NSAIDS) would be inappropriate during the bone fusion process.

19  *Id*. A note on Dr. Mohit's recommendation form from defendant Boyce states that plaintiff has a

20  "lower bunk HSR." *Id*. Defendant Colter confirms she issued an HSR for a lower bunk for 60

21  days after plaintiff's surgery when plaintiff was discharged from the IPU. Dkt. 113 at ¶ 36.

22

23  _____

24    [9] Plaintiff elsewhere makes a contradictory statement that she was "not wearing her neckbrace because it was drying out after she had scrubbed it out because it had green pus all over it." Dkt. 116 at 24.

1    The next day, on October 31, 2017, plaintiff reported "pus and green drainage" from her

2    wound. Dkt. 113-1 at 41. She first saw a nurse, who reported "slight" weepage with no obvious

3    signs of infection. *Id*. At the nurse's request, defendant Colter also examined plaintiff; defendant

4    Colter's notes report the incision site "looks good" with no erythema, drainage or abscess. *Id*.

5    Defendant Colter ordered the discontinuation of NSAIDs, consistent with Dr. Mohit's

6    recommendation. *Id*. While she did not prescribe hydrocodone, defendant Colter issued a

7    prescription for acetaminophen with codeine (Tylenol #3) for seven days, then moving to

8    Tylenol only. *Id*.[10] Plaintiff's medication records reflect these changes, showing she received

9    acetaminophen with codeine from November 1 through November 7. Dkt. 113-1 at 89. Plaintiff

10   also continued to receive methocarbamol during this period. *Id*.[11]

11   Two days later, on November 2, 2017, plaintiff called a medical emergency for reported

12   drainage from her incision site. Dkt. 113-1 at 43. Non-defendant C. Daley assessed plaintiff at

13   her cell, and took vital signs (reflecting, *inter alia* a temperature of 98°). *Id*. The records of this

14   visit report the incision site was "well approximated, healing and pink around edges," but a

15   "continuous drip" of yellowish drainage was observed from a "small spot" at the lower end of

16   the surgical site. *Id*. The area was covered with a dressing and plaintiff was instructed to sign up

17   for sick call the next day. *Id*.

18   Plaintiff saw defendant Suarez the next day, November 3, 2017. Her vital signs included

19   a temperature of 97°, and examination of the surgical site showed tenderness, reddening and

20   slight crusting, but it appeared "appropriate for post surgery." Dkt. 113-1 at 44 (Dkt. 116 at 151).

21

22   _____

     [10] Defendant Colter states that Tylenol (acetaminophen) is not an NSAID. Dkt. 113 at ¶ 22.

23   [11] Following this visit, defendant Colter was reassigned to work outside WCCW from November 1, 2017
     through January 15, 2017 and was not involved in plaintiff's treatment during that time. Dkt. 113 at ¶ 8. It appears a
     different physician, non-defendant Dr. Lisa Anderson, supervised plaintiff's care during that time. *See, e.g.* Dkt. 116

24   at 153 (Dr. Anderson's November 14, 2017 order for Oxycodone).

Defendant Boyce also noted yellow drainage after removing plaintiff's dressing. *Id*. She
consulted with Dr. Mohit's office, which instructed that plaintiff be placed on the antibiotic
Bactrim for 14 days. *Id*; *see also* Dkt. 116 at 143. A follow-up appointment with Dr. Mohit was
scheduled for November 14. Dkt. 116 at 143.

Plaintiff continued to receive regular dressing changes and examinations of her wound.
*See, e.g.* Dkt. 116 at 151 (November 5 dressing change), Dkt. 113-1 at 45 (noting continuation of
"daily dressing changes"); *Id*. at 45–49 (nursing notes regarding dressing changes); *Id*. at 63–67
(116 at 156–60) (wound care flow sheets). The notes of non-defendant nurse S. Cooper state that
on November 5, plaintiff reported the wound was draining "continuously all day long" and
plaintiff was "putting feminine pads on it." Dkt. 116 at 44. Subsequent nursing notes indicate the
drainage was increasing and note it was "purulent" and "copious" during the week preceding
November 11—requiring multiple daily dressing changes. Dkt. 113-1 at 45–49. On November
10, non-defendant Physician's Assistant C. Delmondo ordered an additional antibiotic (Keflex)
be given to plaintiff along with the Bactrim that had previously been prescribed on Dr. Mohit's
recommendation. Dkt. 113-1 at 46. Plaintiff also received a prescription for oxycodone for
"severe neck pain." *Id*. Plaintiff saw defendant Boyce on November 13, who noted "purulent
drainage" and "tunneling" at the surgical site and ordered continuation of the Keflex antibiotic.
Dkt. 116 at 148.

Plaintiff attended her scheduled follow-up with Dr. Mohit the next day, on November 14,
2017. Dkt. 113-1 at 53 (Dkt. 116 at 147). She was referred for an infectious disease consultation
for a "suspected MRSA infection." *Id.* Upon returning to WCCW from this appointment,
plaintiff was admitted to the IPU, and lab tests and cultures were taken and sent to CHI
Franciscan St. Joseph's hospital. Dkt. 113-1 at 52 (Dkt. 116 at 154). The consultation report

1    (dated November 14, 2017) recommended plaintiff be switched to a different antibiotic if lab

2    testing confirmed MRSA. Dkt. 113-1 at 55 (Dkt. 116 at 150). The report also specified a wound

3    care protocol, recommended plaintiff be assigned a lower bunk and that oxycodone pain

4    medications be continued "until 12 weeks post-op." *Id*. Dr. Anderson issued orders on the same

5    day calling for wound care as recommended in the consultation report, and also prescribed

6    oxycodone to be given prior to dressing changes. Dkt. 113-1 at 52 (Dkt. 116 at 153). Plaintiff's

7    medication records show she received oxycodone during this period. Dkt. 113-1 at 84–88.

8        On November 16, 2017, plaintiff's wound culture returned positive for "light growth

9    staphylococcus aureus." Dkt. 113-1 at 57 (Dkt. 116 at 141). A subsequent record from CHI

10   Franciscan, dated November 21, 2017, shows a diagnosis of the methicillin-resistant form of

11   staphylococcus aureus (MRSA). Dkt. 116 at 139.

12       Plaintiff was treated at WCCW in the IPU for her MRSA infection between November

13   2017 and January 2018. Dkt. 113-1 at 59–67; Dkt. 113 at ¶ 29.[12] In addition, plaintiff's medical

14   records reflect multiple offsite visits to CHI Franciscan Wound Care Center for treatment. Dkt.

15   113-1 at 69–74.

16       Defendant Colter reports that notes from plaintiff's wound care clinic state her wound

17   was healed as of January 16, 2018. Dkt. 113 at ¶ 25.

18                          **III. STANDARD OF REVIEW**

19   **A.    Summary Judgement Standard**

20       Summary judgment is proper only if the pleadings, discovery, and disclosure materials on

21   file, and any affidavits, show there is no genuine dispute as to any material fact and the movant is

22   _____

23       [12] Although plaintiff's complaint alleges she spent "one year" in the IPU being treated for MRSA (Dkt. 17
     at 14), her declaration concedes, consistent with her medical records, that this was actually a period of three or four
24   months. Dkt. 116 at 183, ¶ 109.

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Mere disagreement or bald assertion stating a genuine issue of material fact exists does not preclude summary judgment. *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). Allegations based merely on the plaintiff's belief are insufficient to oppose summary judgment, as are unsupported conjecture and conclusory statements. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). In such circumstances, the Court "rule[s] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156

1  (9th Cir. 2015) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal

2  Practice and Procedure § 2720 (3d ed. 1998)); *see also Las Vegas Sands, LLC v. Nehme*, 632

3  F.3d 526, 532 (9th Cir. 2011) ("the court must consider each party's evidence, regardless under

4  which motion the evidence is offered").

5  **B.    Section 1983 Standard**

6          To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the conduct

7  complained of was committed by a person acting under color of state law, and (b) the conduct

8  deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the

9  United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*,

10 *Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an

11 alleged wrong only if both of these elements are present. *See Haygood v. Younger*, 769 F.2d

12 1350, 1354 (9th Cir. 1985).

13         The causation requirement of Section 1983 is satisfied only if a plaintiff demonstrates

14 that a defendant did an affirmative act, participated in another's affirmative act, or omitted to

15 perform an act which he was legally required to do that caused the deprivation complained of.

16 *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson v. Duffy*, 588 F.2d 740,

17 743–44 (9th Cir. 1978)). In addition, government officials may not be held liable for the

18 unconstitutional conduct of their subordinates under a theory of supervisory liability. *See Monell*

19 *v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (finding no vicarious

20 liability for a municipal "person" under 42 U.S.C. § 1983). Because vicarious liability is

21 inapplicable to Section 1983 suits, a plaintiff must plead that each government-official

22 defendant, through the official's own individual actions, has violated the Constitution.

23

24

# IV. DISCUSSION

## A.  Defendants' Motion to Strike

Defendants move to strike portions of plaintiff's cross-motion for summary judgment. Dkt. 118 at 3–5. Specifically, defendants seek to strike plaintiff's statements in her opening brief (Dkt. 116) at pp. 14, 16, 16–17, 17, 29 and 48.

A court may consider only admissible evidence in ruling on a motion for summary judgment. *Orr*, 285 F.3d at 773. At the summary judgment stage, the Court is focused on the admissibility of the content, rather than the form, of the evidence. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003), *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56."). Thus, even declarations that contain hearsay may be considered at summary judgment if the content could be presented in admissible form at trial. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004). Furthermore, District courts must "construe liberally motion papers and pleadings filed by *pro se* inmates and . . . avoid applying summary judgment rules strictly[.]" *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

The statements challenged by defendants generally fall into three categories: (1) statements regarding the signs, transmission and effects of MRSA (Dkt. 116 at 14, 16, 17); (2) assertions that plaintiff was placed upon the "wrong medication" (Dkt. 116 at 16–17, 29); and (3) references to CDC guidance and federal Bureau of Prisons ("BOP") guidelines (Dkt. 116 at 16–17, 48).

Defendants contend plaintiff lacks foundation as an expert to make the assertions regarding MRSA in the first category. The Court notes that one of plaintiff's references merely

1  paraphrases case law (Dkt. 116 at 16). The Court construes the other references as argument,

2  rather than assertions of fact and declines to strike them.

3      With respect to the second category, the Court likewise construes plaintiff's statements as

4  argument, based upon her interpretation of her medical records. The Court agrees plaintiff lacks

5  foundation to assert medical opinions and will not accept any such opinion as evidence.

6      The Court declines to strike plaintiff's discussions of CDC guidelines. Defendants claim

7  they are inadmissible as hearsay, but plaintiff could introduce the evidence at trial as

8  impeachment. Furthermore, defendant Colter's declaration also relies upon CDC guidance. *See*

9  Dkt. 113 at ¶ 34. The Court construes plaintiff's discussion of the BOP guidelines as argument;

10 plaintiff's reference appears to be part of a series of legal citations that is followed by case law.

11     The Court declines to strike the statements challenged by defendants; however, it will

12 also not consider the statements as evidence.

13 **B.  Claims Against Defendant Wofford**

14     Plaintiff's only mention of defendant Wofford in the Third Amended Complaint is an

15 allegation that plaintiff was denied an opportunity to bring an emergency grievance in violation

16 of her First and Fourteenth Amendment rights. Dkt. 17 at 17.

17     The Third Amended Complaint does not allege an Eighth Amendment claim against

18 defendant Wofford, and plaintiff has produced no facts supporting such a claim. First, plaintiff

19 has provided no evidence establishing defendant Wofford personally participated in plaintiff's

20 medical care or acted with deliberate indifference with respect to that care. Prison officials who

21 are not medical providers are not deliberately indifferent when they defer to the judgment of

22 treating medical providers. *See Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004); *Hayes v.*

23 *Snyder,* 546 F.3d 516, 526–28 (7th Cir. 2008); *cf. Peralta v. Dillard,* 744 F3d 1076, 1086–87

24

1  (9th Cir. 2014) (non-specialist doctor was not deliberately indifferent when he deferred to

2  specialist).

3      Further, defendant Wofford cannot be held vicariously liable for the acts of staff under

4  her supervision. "A supervisor may be liable under § 1983 only if there exists either '(1) his or

5  her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

6  between the supervisor's wrongful conduct and the constitutional violation.'" *Jeffers v. Gomez*,

7  267 F.3d 895, 915 (9th Cir. 2001). Supervisors may not, however, be held liable merely for being

8  present at the scene of a constitutional violation or for being a member of the same operational

9  unit as a wrongdoer. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018) (citing *Jones v.*

10  *Williams*, 297 F.3d 930, 936–37 (9th Cir. 2002)).

11      Plaintiff has submitted no evidence defendant Wofford either personally participated in

12  plaintiff's medical care or had any causal connection to the alleged wrongful conduct. Senior

13  prison administrators cannot be held vicariously liable for the alleged acts of prison medical

14  personnel. *Hamby v. Hammond*, 821 F.3d 1085, 1093 n.4 (9th Cir. 2016) ("We note that

15  Secretary Warner cannot be held vicariously liable under § 1983 for any violations committed by

16  prison medical personnel"); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (State

17  Department of Corrections Director cannot be held vicariously liable for the fault of prison

18  personnel); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of

19  medical experts . . . , a non-medical prison official will generally be justified in believing that the

20  prisoner is in capable hands."). The Court therefore recommends plaintiff's Eighth Amendment

21  claims against defendant Wofford be dismissed.

22      Plaintiff's grievance-processing claim similarly allege no conduct by defendant Wofford.

23  Plaintiff asserts only that defendant Wofford "put out a new policy" requiring emergency

24

medical grievances be directed to her, and that the non-defendant grievance coordinator failed to do so. Dkt. 17 at 17. But even if plaintiff had provided a sufficient factual basis, her claim would nonetheless fail as a matter of law. "There is no legitimate claim of entitlement to a [prison] grievance procedure." *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988). Prisoners "lack a separate constitutional entitlement to a specific prison grievance procedure," so a stand-alone claim based on a deprivation of the grievance procedure does not implicate due process. *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (citing *Mann*, 855 F.2d at 640). And plaintiff has adduced no facts supporting any claim of retaliation against her by defendant Wofford for bringing grievances and has therefore not stated a First Amendment claim. *See Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (listing elements of a retaliation claim).

Because plaintiff has not established facts supporting a claim against defendant Wofford, the court recommends all claims against her be dismissed with prejudice.

## C.  Medical Deliberate Indifference Claims

Plaintiff contends defendants Colter, Suarez, Boyce and Meitninger-Dunlap violated her Eighth Amendment rights in her post-operative treatment by prematurely terminating her pain medication, by failing to properly respond to her declarations of medical emergencies on October 25, 2022, and by failing to prevent and improperly treating her MRSA infection. Dkt. 17 at 11–18, 22.

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The two-prong test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need

1    was deliberately indifferent." *Jett*, 439 F.3d at 1096 (*quoting McGuckin v. Smith*, 974 F.2d 1050,

2    1059 (9th Cir. 1992) *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d

3    1133 (9th Cir. 1997)).

4         The defendants must have known of and disregarded an excessive risk to the plaintiff's

5    health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference is shown when

6    prison officials consciously disregard an excessive risk of harm to an inmate's health or safety.

7    *Id*. at 838–40. It is "obduracy and wantonness, not inadvertence or error in good faith, that

8    characterize the conduct prohibited by the Cruel and Unusual Punishment Clause[.]" *Wilson v.*

9    *Seiter*, 501 U.S. 294, 299 (1991).

10        Deliberate indifference "may appear when prison officials deny, delay or intentionally

11   interfere with medical treatment, or [ ] may be shown by the way in which prison physicians

12   provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). However,

13   delay in providing a prisoner treatment does not constitute an Eighth Amendment violation unless

14   the delay causes substantial harm. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d

15   404, 407 (9th Cir. 1985); *Amarir v. Hill*, 243 F. App'x. 353, 354 (9th Cir. 2007).

16        Further, a mere difference of opinion about treatment between plaintiff and prison

17   medical authorities "does not give rise to a § 1983 claim[.]" *Franklin v. St. of Or., State Welfare*

18   *Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981). "Deliberate indifference is a high legal standard. A

19   showing of medical malpractice or negligence is insufficient to establish a constitutional

20   deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.

21   2004). A prisoner must instead show the chosen course of treatment "was medically unacceptable

22   under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the

23   prisoner's] health." *Jackson*, 90 F.3d at 332; *see also Toguchi*, 391 F.3d at 1058.

24

1    1.    Post-Operative Care

2    Plaintiff contends defendant Colter violated her Eighth Amendment rights by failing to

3    provide adequate post-operative care, including terminating plaintiff's opioid pain medication

4    nine days after her surgery. Dkt. 17 at 22; Dkt. 116 at 23–24.

5    Plaintiff's complaint makes sweeping, conclusory allegations that "zero post-operative

6    care was provided" and she was released to the general prison population "to care for herself."

7    Dkt. 17 at 11. These allegations are demonstrably disproved by plaintiff's medical records,

8    which show extensive post-surgical follow-up care from WCCW medical staff, as well as

9    follow-up care from plaintiff's outside surgeon. Plaintiff was seen by WCCW physicians on the

10   first two days after her return from surgery. Dkt. 113 at ¶ 17. During the period immediately

11   following her transfer from the IPU, plaintiff received regular follow-up nursing visits, including

12   dressing changes, and received pain medications. Dkt. 113-1 at 27–29, 32, 91. Plaintiff was taken

13   offsite for follow-up visits with her surgeon. Dkt. 113-1 at 41, 53. After plaintiff's wound

14   worsened, she received daily dressing changes and examinations of her wound. Dkt. 113-1 at

15   43–49, 151 59–67. The evidence shows defendants did not withhold post-operative care.

16   Plaintiff suggests defendant Colter acted with deliberate indifference in transferring her

17   from the IPU. Dkt. 17 at 11. Defendant Colter reports plaintiff had destroyed furniture and

18   fixtures in her IPU room, and plaintiff admits she "tore the room up". Dkt. 113 at ¶ 17; Dkt. 116

19   at 180, ¶ 8. Plaintiff was transferred to restrictive housing after she threatened self-harm. Dkt.

20   113 at ¶ 17. The evidence shows plaintiff continued to receive nursing care while in restrictive

21   housing. Dkt. 113-1 at 27–29, 32, 91. The very purpose of the transfer was to prevent the

22   possibility of plaintiff's threatened self-harm; it therefore cannot be said such action was

23   deliberately indifferent to a risk of serious harm.

24

1    Plaintiff's briefing focusses on defendant Colter's October 24 termination of plaintiff's

2 prescription for opioid pain medication. *See*, *e.g.* Dkt. 134 at 11–12. But plaintiff fails to produce

3 evidence defendant Colter acted with deliberate indifference to plaintiff's medical needs.

4    Plaintiff was prescribed Oxycodone, as well as other pain medications including NSAIDs

5 and Robaxin after her return from surgery. Dkt. 113-1 at 27–29, 91. Due to the dangers of long-

6 term used of Oxycodone, defendant Colter discontinued it on October 24, nine days after

7 surgery. Defendant Colter explains that Centers for Disease Control guidelines recommend only

8 temporary use of opioids for acute pain post-surgery. Dkt. 113 at ¶ 34. In her medical opinion,

9 long-term use of opioids can be "significantly more harmful than helpful" and pose a significant

10 risk of addiction when used on a chronic basis for nonacute pain. *Id*. Notably, plaintiff continued

11 to receive other pain medications, including Robaxin—a medication plaintiff states has "always

12 worked for me" (Dkt. 116 at 176).

13    Plaintiff argues the termination of her oxycodone prescription was contrary to the advice

14 in the October 30 post-surgical consultation report of her surgeon. Dr. Mohit states plaintiff

15 would benefit from pain management, and "typically we prescribe hydrocodone due to bone

16 fusion"; his report also states NSAIDs are not appropriate during the bone fusion process. Dkt.

17 116 at 149. The next day, defendant Colter discontinued plaintiff's NSAID, consistent with this

18 recommendation. Dkt. 113-1 at 41. In addition, she prescribed a seven-day course of Tylenol 3—

19 which contains the opiate codeine—to be followed by regular Tylenol. *Id*.[13]

20    Plaintiff has not established defendant Colter acted with deliberate indifference to her

21 serious medical needs. Defendant Colter ensured that plaintiff continued to have medications to

22

23    [13] Dr. Mohit also recommended plaintiff be assigned a lower bunk. Dkt. 116 at 149. Defendant Colter had
already issued a 60-day HSR for a lower bunk on October 19, when plaintiff was discharged from the IPU. Dkt. 113

24 at ¶ 36.

1  manage her pain, and issued medication orders consistent with the recommendations of Dr.

2  Mohit. But even if it could be said that her orders conflicted with those recommendations, this

3  would at most present different recommendations from medical providers about the optimal

4  duration of opioid pain relief. A difference of opinion on the advisability of opioid pain

5  medication does not establish deliberate indifference to a serious medical need. *Jackson*, 90 F.3d

6  at 332 (prisoner must show the chosen course of treatment "was medically unacceptable under the

7  circumstances,"). *See also Fausett v. Leblanc,* 553 F. App'x 665, 667 (9th Cir. 2014) (decision

8  not to provide plaintiff with Valium as prescribed after spinal fusion surgery, but instead to

9  provide substitute medicine along with other pain medication, did not constitute deliberate

10  indifference); *Gauthier v. Stiles*, 402 F. App'x 203 (9th Cir. 2010) (prisoner's disagreement with

11  the dosage and type of pain medication administered after surgery did not rise to the level of

12  deliberate indifference); *Shiira v. Hawaii*, 706 F. App'x 436, 437 (9th Cir. 2017) ("By itself, a

13  failure to administer narcotic pain medication does not constitute a constitutional violation,"

14  particularly where alternative pain medications were offered); *Miller v. California Dep't of Corr.*

15  *& Rehab.*, No. 16-CV-02431-EMC, 2018 WL 534306, at*17, *19 (N.D. Cal. Jan. 24, 2018)

16  (decision to taper plaintiff's narcotic morphine medication and to replace it with accepted non-

17  narcotic pain medications did not constitute deliberate indifference)[14]

18      Plaintiff has failed to establish defendant Colter acted with deliberate indifference to

19  plaintiff's serious medical needs in plaintiff's post-operative care. Accordingly the Court

20  _____

21  [14] Plaintiff also cites a later report from an infectious disease consultation, apparently contending defendant
Colter failed to comply with its recommendations. The report, which was issued after plaintiff's infection developed,

22  contains a recommendation to "continue pain meds—Percocet or Oxycodone until 12 weeks post-op." Dkt. 116 at
150. But the report is dated November 14, 2017—and thus did not exist when defendant Colter discontinued
plaintiff's Oxycodone prescription; furthermore, it was issued during defendant Colter's absence from WCCW.

23  Moreover, Dr. Anderson (who had taken over during Dr. Colter's hiatus) issued an order the same day, consistent
with the recommendation, which prescribed oxycodone to be given during plaintiff's dressing changes. Dkt. 113-1

24  at 52.

recommends granting defendants' motion for summary judgment and denying plaintiff's cross-

motion with respect to this claim.

2. <u>Response to Plaintiff's October 25, 2017 Declaration of Medical Emergency</u>

Plaintiff contends the three medical staff (defendants Suarez, Boyce and Meitningner-

Dunlap) who responded to her two declarations of medical emergencies on October 25 acted

with deliberate indifference to her serious medical need by failing to examine her.

Here, the parties' evidence conflicts. Defendants reported in their chart notes that plaintiff

was agitated and disruptive: defendant Suarez reported vital signs were not taken due to

plaintiff's agitation, pacing and insulting custodial staff; defendant Boyce reported plaintiff was

"very agitated" and was "kicking and throwing things in her cell." Dkt. 113-1 at 34, 132. All

three reported plaintiff had removed her cervical collar. *Id*. at 34, 132, 36. And all three stated

plaintiff's primary concern was the termination of her Oxycodone prescription and a request for

a pillow (which was ultimately provided). *Id*. Each defendant also states plaintiff's incision was

visible through her cell window and was in good condition with no signs of infection. *Id*.

Plaintiff, on the other hand, testifies that while she had previously been "hot" and

"upset," by the time medical staff arrived she was merely "crying and redfaced." Dkt. 116 at p.

182 ¶ 97. She states she called both medical emergencies because "there was green pus oozing

from my neck" and she was concerned she might have MRSA. *Id*. at p. 181 ¶ 87.[15] Plaintiff

states defendants would not have been able to visualize her incision from outside her cell

because she was wearing her neck brace (*Id*. at 180 ¶ 87); however, plaintiff also makes a

contradictory statement that she had removed her brace to wash it (Dkt. 116 at 24).

---

[15] Plaintiff also submits testimony from a fellow inmate who states she saw "green pus" coming from
plaintiff's post-surgical wound on October 24 and 25. Dkt. 116 at 130.

1    While these facts are disputed, what is material is defendants' state of mind. *Farmer*, 511

2    U.S. at 838. Chart notes from the previous day indicated plaintiff's wound was "clean, dry and

3    intact" without odor, drainage or other signs of infection. Dkt. 113-1 at 32. Defendants' chart

4    notes from the October 25 encounters show they understood plaintiff's concern to be her pain

5    medication and request for a pillow—rather than any issues with her incision. And defendant

6    Colter testifies that as a medical matter, it is not uncommon to have some drainage from a wound

7    site and it does not necessarily indicate an infection. Dkt. 113 at ¶ 8.

8    Thus, the evidence suggests defendants did not subjectively disregard a serious risk to

9    plaintiff's health. However, on summary judgment, the Court must credit plaintiff's evidence and

10   draw all inferences in her favor. Accordingly, the Court finds that an issue of material fact exists

11   regarding defendants' knowledge of a serious medical need.

12   However, that does not end the Court's inquiry. Delayed medical treatment does not

13   violate the Eighth Amendment unless the delay causes substantial harm. *Shapley*, 766 F.2d at 407.

14   Plaintiff provides no evidence of such harm. Indeed, the uncontroverted evidence shows otherwise.

15   Plaintiff was examined by her outside surgeon, Dr. Mohit, just five days later. Dkt. 113-1 at 41. Dr.

16   Mohit removed plaintiff's sutures and made no note of any issues or signs of infection with the

17   incision. *Id*. The next day, a nurse observed "slight" weeping from the site with no signs of

18   infection; an examination by Dr. Colter that same day noted the incision "looks good" with no

19   erythema, drainage or abscess. *Id*.

20   Thus, the uncontroverted evidence shows that to the extent there were issues with

21   plaintiff's wound on October 25, they had resolved five days later, and three different medical

22   professionals found no reason to suspect an infection. Plaintiff's bald assertion that an examination

23

24

1  by defendants on October 25 would have led to an earlier MRSA diagnosis is purely speculative

2  and unsupported by evidence.

3      Plaintiff has not established that defendants' failure to examine her wound on October 25

4  violated her Eighth Amendment rights. The Court therefore recommends granting defendants'

5  motion for summary judgment and denying plaintiff's cross-motion with respect to this claim.

6      3.  <u>Initial Treatment of Infection</u>

7      Plaintiff also contends defendants violated her Eighth Amendment rights by improperly

8  treating her infection when it was originally detected. Specifically, plaintiff asserts defendants

9  prescribed the "wrong medication." Dkt. 116 at 16, 18, 29. Plaintiff relies for this contention on a

10 November 14, 2017 note from her outside infectious disease clinic which states that if cultures of

11 plaintiff's wound were positive for MRSA, plaintiff should be switched to a different antibiotic.

12 Dkt. 116 at 150. Plaintiff's evidence raises no more than a difference of medical opinion, which

13 is not sufficient to establish deliberate indifference.

14     Mere differences of opinion between a prisoner and prison medical staff or between

15 medical professionals regarding the proper course of treatment does not give rise to a § 1983

16 claim. *Toguchi*, 391 F.3d at 1058. "[T]o prevail on a claim involving choices between alternative

17 courses of treatment, a prisoner must show that the chosen course of treatment 'was medically

18 unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive

19 risk to [the prisoner's] health.'" *Id.* (*citing Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.

20 1996)).

21     Plaintiff has not made that showing here. Indeed, the course of the initial detection and

22 treatment of plaintiff's infection shows defendants acted reasonably and were not deliberately

23 indifferent to her medical needs. After plaintiff called a medical emergency on November 2, a

24 non-defendant medical staff member noted a small discharge and plaintiff was scheduled for sick

call the next day. Dkt. 113-1 at 43. At that time, both defendant Suarez and defendant Boyce

noticed drainage, although noting the wound appeared "appropriate for post surgery." *Id*. at 44.

Defendant Boyce nonetheless consulted with Dr. Mohit's office and, on his advice, placed

plaintiff on the antibiotic Bactrim. *Id*. This antibiotic, suggested by plaintiff's outside surgeon, is

"an appropriate drug to treat a . . . MRSA infection. Dkt. 113 at ¶10.

Plaintiff was also scheduled to see Dr. Mohit two weeks later. Throughout the

intervening period, she received daily dressing changes and treatment (sometimes multiple times

per day). Dkt. 113-1 at 44–50. Plaintiff also received prescriptions for an additional antibiotic

(Keflex) to accompany the Bactrim recommended by Dr. Mohit, and Oxycodone for the pain she

was experiencing. Dkt. 113-1 at 46.

At plaintiff's November 14 follow-up visit with Dr. Mohit, she was referred for an

infectious disease consultation for suspected MRSA. Dkt. 116 at 150. Upon returning to WCCW,

she was admitted to the IPU; lab tests and cultures taken at that time ultimately revealed a

staphylococcus infection on November 16, and on November 21 plaintiff was diagnosed with an

infection by the MRSA form of the staphylococcus bacteria. On November 29, her antibiotic was

switched to Rifampin. Dkt. 116 at 155.

The evidence demonstrates that as soon as plaintiff's treating professionals suspected an

infection, they responded—both treating the wound and providing antibiotics recognized as

medically appropriate. That plaintiff's outside infectious disease consultant later recommended a

different antibiotic in no way demonstrates defendants acted with deliberate indifference.

Instead, it shows only a difference in medical opinion.

Indeed, courts have rejected Eighth Amendment claims arising out of MRSA infections

where defendants have refused to prescribe *any* antibiotics. *See*, *e.g. Callion v. Adams*, No. 14-

1   CV-03716-HSG, 2016 WL 5946851, at *15–*16 (N.D. Cal. Sept. 29, 2016) (treatment of

2   plaintiff's fistula without prescribing antibiotics to treat MRSA infection was not medically

3   unacceptable); *Cunningham v. Belleque*, No. CV-03-1239-MO, 2006 WL 468377, at *3 (D. Or.

4   Feb. 24, 2006) (prison officials' refusal to provide plaintiff with Linezolid to treat his MRSA did

5   not violate Eighth Amendment where plaintiff was regularly seen for his medical

6   issues); *cf. Ramirez v. Dayalan*, No. C 08-3766 WHA PR, 2010 WL 3636215, *2 (N.D. Cal.

7   Sept. 14, 2010) (failure to perform lab tests on suspected MRSA-infected boils did not violate

8   Eighth Amendment when plaintiff received treatment, including antibiotics, even though the

9   infection recurred; court noted antibiotic treatment for MRSA was more aggressive treatment

10  than some doctors would have ordered).

11       Here, plaintiff received extensive treatment of her suspected infection and an antibiotic

12  recognized as an acceptable MRSA treatment. After MRSA was confirmed, she was switched to

13  a different antibiotic. Plaintiff has submitted no evidence demonstrating her course of treatment

14  was medically unacceptable or chosen in conscious disregard of an excessive risk to her health.

15  Plaintiff has therefore not established an Eighth Amendment claim arising out of the initial

16  course of treatment of her infection. Accordingly, the Court recommends granting defendants'

17  motion for summary judgment and denying plaintiff's cross-motion with respect to this claim.

18  **D.    Claims Arising Prior to May 1, 2017**

19       The operative complaint in this matter states it is asserting claims for inadequate post-

20  operative medical care "from 10-17-2017 through 11-02-2017" and is "based on the second

21  medical emergency called by Bishop on 10-25-17 at 12:40 pm." Dkt. 17 at 10. However, the

22  complaint also contains factual allegations predating the surgery, asserting defendants

23  improperly delayed approval of plaintiff's surgery and failed to prescribe sufficient pain

24  medication, including Robaxin, "between 2012 and 2017." Dkt. 17 at 21. Defendants argue these

1    claims are barred by the statute of limitations because they accrued more than three years before

2    plaintiff filed her original complaint on May 1, 2020. Dkt. 112 at 20–21.

3        Section 1983 does not contain a statute of limitations; therefore, federal courts apply the

4    applicable period of limitations under state law for the jurisdiction in which the claim arose. *Rose*

5    *v. Rinaldi*, 654 F.2d 546, 547 (9th Cir. 1981). In Washington, the applicable statute is the three-

6    year period for personal injury actions. Washington's statute provides as follows:

7        The following actions shall be commenced within three years: . . . (2) An action for
         taking, detaining, or injuring personal property, including an action for the specific
8        recovery thereof, or for any other injury to the person or rights of another not
         hereinafter enumerated.

9    RCW 4.16.080(2); *see also Rose*, 654 F.2d at 547 (Washington's 3-year period applicable to

10   personal injury cases applies to Section 1983 claims).

11       Federal law determines when a civil rights claim accrues. *TwoRivers v. Lewis*, 174 F.3d

12   987, 991 (9th Cir. 1999). A claim accrues when the plaintiff knows or has reason to know of the

13   injury which is the basis of the action. *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996).

14   Plaintiff does not contend, and there is no evidence indicating, that she was unaware of the

15   alleged injury caused by the pre-2017 acts of which she complains. Accordingly, claims

16   premised upon defendants' acts or omissions occurring more than three years before the May 1,

17   2020 filing of plaintiff's initial complaint are barred by the statute of limitations.

18       Plaintiff contends her claims are timely under the continuing violation doctrine, an

19   exception to the ordinary rule of accrual applicable when a defendant's conduct is part of a

20   continuing practice. Dkt. 134 at 9. However, the Ninth Circuit has sharply limited the continuing

21   violation doctrine, noting that "little remains" of the doctrine under federal law. *Bird v. Dep't of*

22   *Hum. Servs.*, 935 F.3d 738, 746 (9th Cir. 2019).

23

24

1        Historically, the Ninth Circuit recognized two applications of the continuing violation

2    rule: (1) the "related acts" continuing violation theory, also known as the "serial acts" theory;

3    and (2) the maintenance of a discriminatory system occurring both before and within the

4    limitations period, also known as the systematic branch of the continuing violation

5    doctrine. *Bird*, 935 F.3d at 746. However, the Supreme Court limited the related acts continuing

6    violation theory in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The Court

7    held "'discrete . . . acts are not actionable if time barred, even when they are related to acts

8    alleged in timely filed charges' because [e]ach discrete . . . act starts a new clock for filing

9    charges alleging that act.'" *Bird*, 935 F.3d at 747 (citing *Morgan*, 536 U.S. at 113). *See*

10   *also Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003)

11   ("Although *Morgan* was a Title VII case . . . we have applied *Morgan* to bar § 1983 claims

12   predicated on discrete time-barred acts, notwithstanding that those acts are related to timely filed

13   claims."). In *Bird*, the Ninth Circuit noted it has also applied *Morgan* "to abrogate the systematic

14   branch of the continuing violations doctrine as well," concluding that "little remains of the

15   continuing violations doctrine." *Bird*, 935 F.3d at 747. Thus, "except for a limited exception for

16   hostile work environment claims . . . the serial acts branch is virtually non-existent." *Id*.

17   Moreover, the "systematic branch" applies only to class-wide pattern-or-practice claims and not

18   to individualized claims. *Id*.

19       Plaintiff's claims involve neither of the extremely limited categories of claims—both

20   limited to employment actions—in which *Bird* recognizes the applicability of the continuing

21

22

23

24

wrong rule. Her claims based upon acts or omissions occurring before May 2017 are therefore barred by the statute of limitations.[16]

The Court recommends granting defendants' motion for summary judgment dismissing plaintiff's claims arising before May 2017 and denying plaintiff's cross-motion with respect to such claims.

## E.    Qualified Immunity

Because the Court recommends dismissal of plaintiff's claims on other grounds, it does not reach defendants' argument they are also qualifiedly immune to plaintiff's claims for damages.

## V. CONCLUSION

For the above stated reasons, the Court recommends defendants' Motion for Summary Judgment (Dkt. 112) be granted and plaintiff's cross-motion for summary judgment (Dkt. 116) be denied, and plaintiff's claims be dismissed with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Fed. R.

---

[16] Plaintiff relies upon two out of Circuit cases, *Shomo v. City of New York*, 579 F.3d 176 (2d Cir. 2009) and *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001), which apply the continuing violation theory to Eighth Amendment prisoner claims. Dkt. 134 at 9. But this Court is bound by Ninth Circuit law; as discussed above, *Bird* precludes the application of the doctrine in this case.

Civ. P. 72(b), the clerk is directed to set the matter for consideration on August 5, 2022 as noted in the caption.

Dated this 18th day of July, 2022.

David W. Christel
United States Magistrate Judge